# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

June 2, 2022

Lyle W. Cayce
Clerk

No. 21-30100

Petro Marine Underwriters, Incorporated; Delta
Energy Management and Consultants, L.L.C.,

*Plaintiffs—Appellees*,

*versus*

Cox Operating, L.L.C.; Cox Oil Offshore, L.L.C.,

*Defendants—Appellants*.

―――――――――――――――

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:17-CV-9955

―――――――――――――――

Before Barksdale, Stewart, and Dennis, *Circuit Judges*.

Per Curiam:*

This breach of contract dispute arises out of an arrangement between Plaintiffs-Appellees Petro-Marine Underwriters, Inc. ("Petro") and Delta Energy Management Consultants, LLC ("Delta") (collectively, "Plaintiffs"), and Defendants-Appellants Cox Operating, L.L.C. and Cox Oil Offshore, L.L.C. (collectively, "Cox") for the payment of bond

―――――――――――――

* Pursuant to 5th Circuit Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Circuit Rule 47.5.4.

commissions to Plaintiffs in exchange for consulting services they provided to assist Cox with the acquisition of certain assets from Chevron USA, Inc. ("Chevron") and the placement of any related bonding. Cox appeals the final judgment in Plaintiffs' favor. We AFFIRM.

## I. Facts & Procedural History

Petro provides surety bond broker services. Delta provides consulting services. Cox is engaged in oil and gas exploration and production. Cox engaged Plaintiffs to provide consulting services related to assets Cox sought to acquire from Chevron.

Before the parties entered into the agreement at issue, Plaintiffs wrote reports for and attended meetings on behalf of Cox. Cox discussed options for compensating Plaintiffs with its insurance broker, McGriff, Seibels, & Williams, Inc. ("McGriff"), and in an email dated September 3, 2015, McGriff informed Cox that it would be willing to share commissions with Plaintiffs. On September 9, 2015, Cox executed an email agreement with Plaintiffs detailing the sharing of commissions between Plaintiffs and McGriff, which was subsequently formalized in a letter ("Letter Agreement"). The Letter Agreement detailed the commission-sharing structure between Plaintiffs and the "Broker or Agent actually acquiring such surety on behalf of Cox." According to the Letter Agreement, Plaintiffs would be compensated when surety bonds were placed or renewed due to Cox's acquisition of the Chevron assets. Thus, the Agreement facilitated future payment for Plaintiffs' past and potential future services. Relevant here, the Letter Agreement provided the following:

> In accordance with our Agreement dated September 9, 2015 between [Cox and Plaintiffs], the parties have further agreed to the following. Delta and Petro have already provided, and may continue to provide, certain consulting services to Cox with regard to the acquisition of Chevron assets and on regulatory

No. 21-30100

issues regarding financial assurances to the federal government and oil and gas companies.

Compensation due Delta and/or Petro for these services shall be due and payable on the initial placement and any subsequent renewals of any surety bonding placed on behalf of any Cox entity which resulted from the acquisition by Cox of interests in certain assets of Chevron in the Gulf of Mexico in Chevron's 2015 offering, regardless of the brokers or agents involved, for as long as Cox owns any interest in those assets. This compensation is due at the initial placement of any such surety whenever that individual event occurs, it being recognized that the assets may likely be bonded over a period of time. . . .

Regarding all surety renewals, the split for all compensation received . . . will be reversed with 65% of all compensation, service fees or gross income received from renewals going to the placing Broker or Agency (or to their interest) and the remaining 35% paid to Petro. . . .

It is further agreed that [Petro] will be made co-broker on all bonds placed on properties purchased from Chevron and is entitled to the above referenced commission structure as long as a Cox related entity has an [sic] any interest in these properties.

In the fall of 2015, oil prices dropped, banks refused to provide Cox with financing for the transaction, and Cox's status as the exclusive potential purchaser of the Chevron assets was set to expire on October 30, 2015. On October 28, 2015, Cox notified Plaintiffs of the deal's uncertainty and advised Plaintiffs to either invoice Cox for the work they had performed or "just let things go."

On December 9, 2015, Cox, Chevron, and Union Oil Company of California ("Union Oil") entered into an Asset Sale and Purchase

No. 21-30100

Agreement ("ASPA") that transferred assets to Cox. The ASPA required Cox to place a $48 million Performance Bond[1] to provide security from Cox to Chevron and Union Oil. Due to the regulation of all offshore operators with the U.S. Department of Interior Bureau of Ocean Energy Management ("BOEM"),[2] Cox placed two additional bonds: a $3 million Area-Wide operator's bond[3] and a $300,000 Right-of-Way bond[4] as security for Cox to BOEM. Cox acquired all three bonds through Aspen American Insurance Company ("Aspen"), a bond surety company. The deal closed on April 15, 2016, and each of the bonds was issued the same day. McGriff was made the sole broker on each of the bonds.

In July 2017, after learning of the bond placements, Plaintiffs sent a letter to Cox demanding commissions from the bond placements. On August 23, 2017, Cox responded with a letter denying an obligation to pay Plaintiffs and giving notice to terminate the Letter Agreement.

On October 2, 2017, Plaintiffs filed the instant suit claiming breach of contract. Cox filed a motion for summary judgment, and Plaintiffs filed a motion for partial summary judgment. The district court denied Cox's motion for summary judgment and granted Plaintiffs' motion for partial summary judgment as to Cox's liability but denied Plaintiffs' motion as to whether Cox acted in bad faith.

Plaintiffs subsequently filed another motion for partial summary judgment seeking past due damages, namely, their share of the bond commissions paid up to and through April 15, 2020. The district court

---

[1] Bond No. SU13887.

[2] *See* 30 C.F.R. § 556.900(a)(3) (2016); 30 C.F.R. § 556.901(a)(2)(ii), (b)(2); 30 C.F.R. § 550.1011(a)(1).

[3] Bond No. SU13888.

[4] Bond No. SU13889.

granted this motion on January 5, 2021, and entered final judgment on both partial summary judgment orders on January 21, 2021. This appeal followed.

## II. Standard of Review

"We review a district court's grant of summary judgment de novo, applying the same standards as the district court." *Hagen v. Aetna Ins. Co.*, 808 F.3d 1022, 1026 (5th Cir. 2015). Summary judgment is appropriate if the record evidence "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Our de novo review includes, of course, "the district court's interpretation of the contract, including the question of whether the contract is ambiguous." *Greenwood 950, L.L.C. v. Chesapeake La., L.P.*, 683 F.3d 666, 668 (5th Cir. 2012).

## III. Discussion

On appeal, Cox argues that the district court erred by holding that: (1) "the procuring cause doctrine did not apply to the Letter Agreement," (2) "the Letter Agreement obligated Cox to name Petro as a co-broker," (3) "the Letter Agreement should not be rescinded due to Cox's error," (4) the Letter Agreement was not properly terminated, and (5) "the Area-Wide and Right-of-Way Bonds were subject to the Letter Agreement." We address each of Cox's assignments of error in turn. This is a diversity action, for which Louisiana state law applies.

### 1. *Procuring cause doctrine*

The district court held that the Letter Agreement was not subject to the hereinafter described procuring cause doctrine because it was not a broker agreement. We agree.

Under Louisiana law, a broker "must prove he was the procuring cause in bringing the parties together on common terms, to be entitled to the agreed commissions" where there was not an exclusive contract. *McLeod v. L. & L. Oil Co.*, 147 So. 2d 241, 243 (La. Ct. App. 1962). Black's Law

Dictionary defines a "brokerage contract" as "an agency agreement employing a broker to make contracts in the name of and on behalf of the principal and for which the broker receives a commission." *Brokerage contract, Black's Law Dictionary* (9th ed. 2009).

Pointing out that the compensation scheme detailed in the Letter Agreement differentiates between Petro and "the placing Broker or Agency" and specifies that compensation shall be due "regardless of the brokers or agents involved," the district court reasoned that the parties intended for Plaintiffs to be compensated regardless of whether they were the placing broker or agency on the Cox-Chevron transaction. Consequently, it held that the Letter Agreement was not a broker agreement and thus was not subject to the procuring cause doctrine.

On appeal, Cox does not contend that the Letter Agreement was a broker agreement. Rather, it asserts that Plaintiffs bore "the burden to prove they were the procuring cause in placing the [b]onds" and that "Plaintiffs never placed any bonds for any properties [Cox acquired]." But, by the plain language of the Letter Agreement, Plaintiffs' compensation was not contingent upon their placement of any bonds for Cox.

Cox directs the court's attention to *Gulf Marine Equipment, Inc. v. C & G Boat Works, Inc.*, 471 F. Supp. 2d 679 (E.D. La.), *aff'd*, 242 F. App'x 207 (5th Cir. 2007) to support its position that application of the procuring cause doctrine does not depend on the existence of a broker agreement. There, the district court held that "it is without question that if Plaintiff were the procuring cause of the C & G—Rigdon Marine contracts, the termination of the brokerage agreement would not prevent Plaintiff from recovering brokerage fees." *Id.* at 682. But *Gulf Marine* is inapposite here for two reasons. First, unlike here, the district court in that case characterized the agreement as a brokerage agreement. *Id.* Second, the case concerned whether the plaintiffs were the procuring cause of contracts the principal entered into

after it terminated its broker agreement with plaintiffs, not whether the procuring cause doctrine applies where a broker agreement never existed. *See id.* at 681–83.

Accordingly, because the Letter Agreement was a contract providing the payment mechanism for Plaintiffs' past and potential future services rather than a broker agreement, we hold that the procuring cause doctrine does not apply.

### 2. *Cox's obligation to name Petro as a co-broker*

Cox argues that "the [d]istrict [c]ourt erred when it held that the Letter Agreement obligated Cox to name Petro as a co-broker." It asserts that an equally reasonable interpretation of the Letter Agreement is that it was Plaintiffs' obligation to affirmatively request Cox to name them as co-brokers. Plaintiffs counter that Cox was "the sole entity with the power to name [Petro] as co-broker" and that the Letter Agreement called for Cox to do so. We agree.

The Letter Agreement states that "[Petro] will be made co-broker on all bonds placed on properties purchased from Chevron." Under Louisiana law, "[w]hen the words of the contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." LA. CIV. CODE ANN. art. 2046. "In addition, a contract provision is not ambiguous where only one of two competing interpretations is reasonable or merely because one party can create a dispute in hindsight." *Tex. E. Transmission Corp. v. Amerada Hess Corp.*, 145 F.3d 737, 741 (5th Cir. 1998).

Cox avers that the Letter Agreement provision is ambiguous because it is written in passive voice and thus does not indicate who is responsible for making Petro a co-broker and when. We are not persuaded by this argument. The district court correctly concluded that this provision is unambiguous because Plaintiffs offer the only reasonable interpretation.

No. 21-30100

Because Cox was the only entity with the power to name Petro as a co-broker, we hold that Cox was automatically obligated to do so.

3. *Rescission of the Letter Agreement*

Cox contends that the district court erred by holding that the Letter Agreement should not be rescinded due to Cox's error. Plaintiffs counter that Cox's argument fails because its assertion of error does not go to the cause of the contract. We agree.

Louisiana Civil Code Article 1948 provides that a party's "[c]onsent may be vitiated by error, fraud, or duress." La. Civ. Code Ann. art. 1948. "If error vitiates a party's consent, the contract may be rescinded." *Chalos & Co., P.C. v. Marine Managers, Ltd.*, No. Civ. A. 14-2441, 2015 WL 6442558, at *7 (E.D. La. Oct. 23, 2015) (citing *Cyprien v. Bd. of Supervisors ex rel. Univ. of La.*, 5 So. 3d 862, 868 (La. 2009)). "Error vitiates consent only when it concerns a cause without which the obligation would not have been incurred and that cause was known or should have been known to the other party." La. Civ. Code Ann. art. 1949. "Cause is the reason why a party obligates himself." La. Civ. Code Ann. art. 1967

Here, the reason why Cox obligated itself was to establish a scheme by which Plaintiffs would be compensated in the future for the consulting services they "ha[d] already provided, and may continue to provide." Cox argues that the Letter Agreement should be rescinded because the uncertainty as to who was obligated to make Petro a co-broker of the bonds, and when (if at all) they were obligated, "sounds in error." But as explained above, the Letter Agreement is not ambiguous, so there was no uncertainty as to who was obligated to make Petro a co-broker. Further, Cox has not asserted an error concerning a cause of the contract. Thus, no error vitiates its consent to the Letter Agreement.

Accordingly, the district court properly held that Cox's defenses of error were unfounded.

8

### 4. *Termination of the Letter Agreement*

Cox asserts that the district court erred when it held that Cox improperly terminated the Letter Agreement. Cox posits that the Letter Agreement is a contract of unspecified duration because it was predicated on a factor that cannot be calculated, assured, or known: Cox maintaining ownership in the Chevron assets. As a result, Cox argues that the Letter Agreement could be terminated at the will of either party under Louisiana Civil Code Article 2024 and that its termination was proper and effective. Plaintiffs counter that the phrase, "as long as Cox owns any interest in those assets" is an uncertain but determinable term, and that the Letter Agreement was subject to termination upon the occurrence of a certain and definite resolutory condition[5] or event: "Cox[] divesting of the interests it acquired in the . . . Chevron assets." We agree with Plaintiffs.

Under Louisiana law, "[a] contract of unspecified duration may be terminated at the will of either party by giving notice, reasonable in time and form, to the other party." La. Civ. Code Ann. art. 2024. Moreover, "[b]ecause duration refers to the term of the contract, Article 2024 should be read *in pari materia* with provisions regarding the term of obligations." *Caddo Gas Gathering L.L.C. v. Regency Intrastate Gas LLC*, 26 So. 3d 233, 236 (La. Ct. App. 2009). Louisiana Civil Code Article 1778 provides:

> A term for the performance of an obligation is a period of time either certain or uncertain. It is certain when it is fixed. It is uncertain when it is not fixed but is determinable either by the intent of the parties or by the occurrence of a future and certain event. It is also uncertain when it is not determinable, in which case the obligation must be performed within a reasonable time.

---

[5] "A conditional obligation is one dependent on an uncertain event." La. Civ. Code Ann. art. 1767. "If the obligation may be immediately enforced but will come to an end when the uncertain event occurs, the condition is resolutory." *Id.*

La. Civ. Code Ann. art. 1778.

We observe no error in the district court's reasoning that the Letter Agreement is subject to a clearly determinable resolutory condition based on the following language: "for as long as Cox owns any interest in those assets" and "as long as a Cox related entity has an [sic] any interest in these properties." Those phrases demonstrate that the Letter Agreement would terminate once Cox no longer owned any interest in the Chevron assets—an uncertain term that is determinable by the occurrence of a future event. In other words, the Letter Agreement was not the type of contract that could be "terminated at the will of either party."

Accordingly, the district court correctly concluded that Cox did not properly terminate the Letter Agreement pursuant to Article 2024.

Cox further contends that the Letter Agreement lapsed because it contemplated a suspensive condition[6] that was never fulfilled: Cox securing the Chevron assets by October 30, 2015. Cox waived this argument by failing to raise it before the district court. *See Rollins v. Home Depot USA*, 8 F.4th 393, 397 (5th Cir. 2021) ("A party forfeits an argument by failing to raise it in the first instance in the district court—thus raising it for the first time on appeal—or by failing to adequately brief the argument on appeal."). But assuming arguendo that Cox did not waive this argument, it is still unfounded because the October 30, 2015, condition is neither expressed nor implied by the Letter Agreement. We thus reject Cox's argument that it was relieved of its obligation to name Petro as a co-broker by virtue of the fact that it acquired the Chevron assets after October 30, 2015.

5. *Area-Wide and Right-of-Way Bonds*

---

[6] "If the obligation may not be enforced until the uncertain event occurs, the condition is suspensive." *Id.*

Finally, Cox argues that the district court erred in holding that the Area-Wide and Right-of-Way Bonds were subject to the Letter Agreement.

Cox and Plaintiffs rely on two different provisions in the Letter Agreement to advance their arguments. In the district court, Cox relied on the same paragraph as Plaintiffs, arguing in its opposition to Plaintiffs' motion for partial summary judgment that the Area-Wide and Right-of-Way bonds were not "related to the Chevron assets." But on appeal, Cox invites this court to look to the fourth paragraph, which reads in relevant part: "It is further agreed that [Petro] will be made co-broker on all bonds placed on properties purchased from Chevron . . . ." Because the Area-Wide and Right-of-Way Bonds were placed as security to BOEM so that Cox could operate in the Gulf of Mexico, Cox reasons that "the Area-Wide and Right-of-Way Bonds were not 'placed on properties purchased from Chevron' within the meaning of the Letter Agreement" and should thus "be excluded from the calculation of commissions owed to the Plaintiffs." Because Cox did not raise this argument before the district court, it is waived, and we decline its invitation to consider it now. *See Rollins*, 8 F.4th at 398 ("We do not ordinarily consider issues that are forfeited because they are raised for the first time on appeal.").

Plaintiffs rely on the second paragraph, which begins:

> Compensation due Delta and/or Petro for these services shall be due and payable on the initial placement and any subsequent renewals of any surety bonding placed on behalf of any Cox entity which resulted from the acquisition by Cox of interests in certain assets of Chevron in the Gulf of Mexico . . . .

Plaintiffs counter that because the placement of the Area-Wide and Right-of-Way Bonds resulted from Cox's acquisition of the Chevron assets, the Letter Agreement contemplates no exception for those bonds and Plaintiffs are entitled to those commissions. We agree with Plaintiffs.

11

No. 21-30100

Relevant here, the cover page of the BOEM form for the Area-Wide Bond states: "BOEM collects this information to hold the surety liable for the obligations and liability of the Principal (lessee or operator)." Both the Area-Wide Bond and the Right-of-Way Bonds identify Aspen as the surety, Cox as the principal, and the Gulf of Mexico as the region covered by the bond. Both bonds bind Aspen to BOEM. The parties stipulated that prior to Cox's acquisition of the Chevron assets, Cox had neither the Area-Wide nor the Right-of-Way Bond filed with BOEM. It posted those bonds for the first time upon taking ownership of the Chevron assets. Accordingly, the Bonds, while required by the federal government, quite literally "resulted from the acquisition by Cox of interests in certain assets of Chevron in the Gulf of Mexico."

We hold that the district court did not err in concluding that the Area-Wide and Right-of-Way Bonds fell within the scope of the Letter Agreement.

## IV. Conclusion

For the foregoing reasons, the district court's judgment is AFFIRMED.